955 F.2d 45
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Alfredo A. ROBINSON, Petitioner-Appellant,
v.
John JABE, Warden, Respondent-Appellee.
 No. 91-1289.
 United States Court of Appeals, Sixth Circuit.
 Feb. 13, 1992.
 
 Before RALPH B. GUY, Jr., and ALAN E. NORRIS and BATCHELDER, Circuit Judges.
 PER CURIAM.
 
 
 1
 The petitioner appeals the district court's denial of a writ of habeas corpus, alleging that his state court murder and conspiracy trial violated his rights to due process, equal protection, the confrontation of witnesses, and the effective assistance of counsel. Finding no merit to any of these claims, we affirm.
 
 I.
 
 2
 The petitioner, Alfredo Robinson, was tried by a jury in Lake County, Michigan, in 1980 for his alleged role in the 1978 death of Phyllis Whittler. Whittler's body was found tied to her bed with two gunshot wounds to the head, superficial knife wounds to the torso, and two fingers severed and missing. After a six-day trial, the jury convicted Robinson of one count of first degree murder and one count of conspiracy to commit first degree murder. The court sentenced Robinson to two terms of life imprisonment.
 
 
 3
 The prosecution's theory of the case was that Robinson had been hired to kill Whittler. The prosecution's chief witnesses, Charles Robbins and Shevonne Wilson, had accompanied Robinson to Lake County the day before the killing. Before Robinson's trial, Robbins pleaded guilty to second degree murder in exchange for dismissal of first degree murder and conspiracy charges. Wilson was acquitted of all charges at her separate trial. A fourth defendant, John Philpot, died awaiting trial.
 
 
 4
 Robbins testified that Robinson, Wilson, and Philpot met in Detroit two days before the murder. According to Robbins, Robinson mentioned "paperwork" on emerging from the meeting, a term Robbins understood to refer to a contract killing.
 
 
 5
 The next day, Robinson, Robbins, and Wilson drove to Lake County. Robbins and Wilson testified that they went to Whittler's home and encountered Whittler and her daughter leaving the trailer. After asking for directions, the trio drove to a motel for the night.
 
 
 6
 Robinson, Robbins, and Wilson returned the next morning. Wilson testified that she and Robinson gained entry into the trailer by telling Whittler that they needed to call a tow truck for their car. After Wilson picked up the telephone, Robinson pulled a gun and told her to leave the trailer. Wilson's fingerprints were found on the telephone.
 
 
 7
 Robbins testified that he then entered the trailer. Robbins stated that he saw Robinson sexually assault Whittler. Then, at the direction of Robinson, Robbins took a knife from the kitchen and stabbed Whittler in the ribs. According to Robbins, Robinson then took the knife from Robbins, stabbed Whittler, and shot her in the head. Robbins testified that Robinson removed two of Whittler's fingers and remarked that was how one collected money on a contract. Robbins, Wilson, and Robinson then returned to Detroit.
 
 
 8
 Both Robbins and Wilson testified that they did not know the purpose of the trip until Robinson killed Whittler. Robbins admitted that he had made widely divergent statements to the authorities. In his first statement, Robbins had denied any involvement. After agreeing to plead guilty to second degree murder, Robbins told the authorities that he had stabbed Whittler once. On cross-examination, Robbins stated that he had lied when he admitted participating in Whittler's murder.
 
 
 9
 Monica Scott, Whittler's daughter, also testified for the prosecution. After telling the police that she had seen two men during the encounter the day before the killing, Scott underwent hypnosis in an attempt to improve her recall. At trial, Scott testified that there were two black men and a third person in the car, but she could not identify any of the occupants. Robinson's counsel was aware that Scott had undergone hypnosis before the trial but did not object to her testimony. On cross-examination, Scott conceded that she had initially told the police that she saw only two people in the car. She did not testify about her hypnosis session.
 
 
 10
 Dr. Lorenzo Nelson testified about Whittler's autopsy. Dr. Charles Black had performed the autopsy in Dr. Nelson's presence, but Dr. Black was ill at the time of the trial and did not testify. Over Robinson's objection, Dr. Black's autopsy report was read to the jury at the conclusion of Dr. Nelson's testimony.
 
 
 11
 The prosecution also produced evidence that Wilson's fingerprints were on Whittler's telephone, Robbins' fingerprints were on Whittler's car, and Robinson's fingerprints were on a beer can found outside the trailer. At the close of the prosecution's case, Robinson moved for a directed verdict on the conspiracy charge. The court denied the motion. Robinson did not testify and called no witnesses. The jury returned guilty verdicts on both counts.
 
 
 12
 The post-conviction history of this case is lengthy. After sentencing, Robinson appealed to the Michigan Court of Appeals. That court affirmed the convictions in 1982. In 1983, the Michigan Supreme Court denied leave to appeal. Robinson filed a habeas petition in the district court in 1984. In 1985, the district court dismissed the petition for failure to exhaust the hypnosis issue. Robinson then filed a delayed motion for a new trial with the trial court and requested an evidentiary hearing on the hypnosis issue. The trial court denied the motions, and the Michigan Court of Appeals and Michigan Supreme Court both denied leave to appeal. In 1988, the trial court disposed of Robinson's other post-trial motions, and the Michigan appellate courts again denied leave to appeal. Finally, Robinson filed this habeas petition, his second, in the district court in 1990.
 
 
 13
 In January 1991, the magistrate recommended that Robinson's petition be denied. The district court adopted the magistrate's recommendation in February 1991. In March 1991, the district court issued a certificate of probable cause for appeal, and this appeal followed.
 
 II.
 
 14
 Robinson first claims that the trial court violated his due process rights by failing to grant him a directed verdict on the conspiracy charge. Robinson contends that the prosecution presented no evidence of an unlawful agreement between Robinson and another person.
 
 
 15
 In reviewing sufficiency of evidence claims, we must view the evidence in the light most favorable to the prosecution. Jackson v. Virginia, 443 U.S. 307, 319 (1979). We must deny relief if "any rational trier of fact could have found the essential elements beyond a reasonable doubt." Id. (emphasis in original).
 
 
 16
 The prosecution need not establish the conspiracy with direct evidence; circumstantial evidence may be used to prove the existence of a conspiracy. See United States v. Hughes, 891 F.2d 597, 601 (6th Cir.1989). Uncorroborated testimony from an accomplice is also constitutionally sufficient to support a conviction. Takacs v. Engle, 768 F.2d 122, 127 (6th Cir.1985).
 
 
 17
 We find that the evidence presented was sufficient for a rational trier of fact to find that an unlawful agreement existed to kill Whittler. Robinson argues that a rational juror could not find such an agreement since both Robbins and Wilson denied any advance knowledge of a plan to kill Whittler. However, Robbins' testimony established that Robinson met with Wilson and Philpot and that Robinson discussed "paperwork" upon emerging from the meeting. Robbins testified that he understood "paperwork" to refer to a contract killing. According to Robbins, Robinson showed Whittler's severed fingers to Philpot after returning to Detroit. Robbins testified that Robinson said he had to go somewhere to get money and that Robinson later gave Robbins $50 for his part in the killing.
 
 
 18
 Wilson's testimony further supports the finding of an unlawful agreement. According to Wilson, Robinson said that "the bitch has to go" because she planned to testify in an arson trial.
 
 
 19
 From this testimony, a rational jury could infer an agreement between Robinson and at least one other person to kill Whittler. We therefore find that the trial court's refusal to direct a verdict on the conspiracy count does not entitle Robinson to habeas relief.
 
 III.
 
 20
 Robinson next argues that Monica Scott's hypnotically refreshed testimony was unreliable. He therefore contends that its admission violated his due process right to a fair trial.
 
 
 21
 The Michigan Supreme Court has held that the "testimony of hypnotized witnesses is inadmissible absent proof by clear and convincing evidence that the testimony being offered was based on facts recalled and related prior to hypnosis." People v. Lee, 434 Mich. 59, 450 N.W.2d 883, 895, cert. denied, --- U.S. ----, 111 S.Ct. 211 (1990). However, the use of post-hypnosis testimony does not amount to a per se due process violation. See Beck v. Norris, 801 F.2d 242, 244-45 (6th Cir.1986). Instead, we must examine the challenged testimony to determine whether it was so unreliable that its admission violated due process. See Beachum v. Tansy, 903 F.2d 1321, 1325-26 (10th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 269 (1990); Bundy v. Dugger, 850 F.2d 1402, 1416 (11th Cir.1988), cert. denied, 488 U.S. 1034 (1989).
 
 
 22
 Scott's pre-hypnosis statement to the police is similar to her trial testimony. In her statement to the police, Scott said that two black men drove up in a white car the morning before the murder. In her trial testimony, Scott testified that there were two men in the front and a third person in the back. When confronted with the discrepancy on cross-examination, Scott explained that she had been upset when she first spoke with the police. We find that this minor discrepancy does not render Scott's testimony unreliable.
 
 
 23
 Furthermore, even if Scott's testimony were unreliable, its admission was harmless beyond a reasonable doubt. The only significant discrepancy between the testimony and Scott's earlier statement was in the number of people in the car. However, both Robbins and Wilson previously had testified that they were in the car with Robinson when they asked Scott for directions. Therefore, Scott's testimony on this point was cumulative. Since Scott's earlier statement indicated that there were two black men in the car, both her statement and her trial testimony supported the inference that Robinson was in the car. Most importantly, Scott could not identify any of the car's occupants either before or after hypnosis. Given the testimony of Wilson and Robbins, Scott was a minor witness. Under these circumstances, any error in the admission of Scott's testimony was harmless beyond a reasonable doubt.
 
 
 24
 We also find meritless Robinson's argument that Scott's testimony violated his Confrontation Clause rights. Robinson cross-examined Scott and confronted her with her statement to the police. Since any hypnotically-induced alteration in Scott's memory was minor and harmless beyond a reasonable doubt, Robinson's alleged inability to examine such an alteration is also harmless. Finally, we observe that Robinson's counsel was aware of the hypnosis session and could have called the hypnotist if he thought that Scott's memory had been altered. The failure to do so belies Robinson's argument that he was denied an opportunity to examine Scott's memory.[1]
 
 
 25
 We therefore find that the admission of Scott's testimony does not warrant habeas relief.
 
 IV.
 
 26
 Robinson's third argument is that the trial court erred by admitting Dr. Black's autopsy report into evidence. At the time of trial, Dr. Black was ill from a stroke and did not testify. The trial court admitted the report under Michigan's business record exception to the hearsay rule. Robinson contends that the admission of the report violated his right to confront witnesses.
 
 
 27
 The Michigan Court of Appeals has held that conclusions and opinions found in an autopsy report are not admissible under either the business record or the public record exception. People v. Shipp, 175 Mich.App. 332, 437 N.W.2d 385, 388-89 (1989). The court noted that the Michigan Rules of Evidence, unlike the federal rules, do not include opinions and diagnoses within the business record exception. Id. Shipp establishes that the admission of the report may have been erroneous under Michigan law. However, an evidentiary error does not necessarily amount to a Confrontation Clause violation.
 
 
 28
 The Supreme Court has held that the use of hearsay evidence against a criminal defendant does not violate the Sixth Amendment if the declarant is unavailable and the statement bears "indicia of reliability." Ohio v. Roberts, 448 U.S. 56, 65-66 (1980). See also Idaho v. Wright, --- U.S. ----, 110 S.Ct. 3139, 3146-47 (1990). A statement contains sufficient indicia of reliability if it falls within a firmly rooted hearsay exception. Roberts, 448 U.S. at 66. "This reflects the truism that 'hearsay rules and the Confrontation Clause are generally designed to protect similar values.' " Id. (quoting California v. Green, 399 U.S. 149, 155 (1970)).
 
 
 29
 As the Michigan Court of Appeals noted in Shipp, opinions and diagnoses in autopsy reports are admissible under the federal business records exception, Fed.R.Evid. 803(6). The advisory committee notes to Rule 803 indicate that federal courts have used versions of this exception since 1936.
 
 
 30
 Since the business records exception is firmly rooted and since Dr. Black's report falls firmly within the exception, Robinson's Confrontation Clause rights were not violated by its admission. The district court, therefore, properly denied habeas relief on this ground.
 
 V.
 
 31
 Robinson's fourth argument is that the trial court denied him a fair trial by refusing to excuse two jurors for cause. One of the jurors was a friend of the prosecutor. The other initially expressed reservations about his ability to follow the judge's instructions and said that he believed that an arrestee is likely to be guilty of some crime. Both men eventually expressed a willingness to follow instructions and to deliver an impartial verdict. Robinson removed both jurors with peremptory challenges.
 
 
 32
 Robinson contends that the trial court's refusal to excuse these jurors for cause required him to waste two peremptory challenges that he would have otherwise used to remove jurors who actually sat on the jury. The Supreme Court has held, however, that an erroneous refusal to disqualify a juror for cause does not amount, in itself, to a violation of the right to an impartial jury even if the error requires the defendant to use a peremptory challenge. Ross v. Oklahoma, 487 U.S. 81, 88 (1988). In Ross, the Court stated that "peremptory challenges are not of constitutional dimension." Id. Therefore, the loss of a peremptory challenge amounts to a violation of a defendant's right to an impartial jury only if the defense exhausts its peremptories and is unable to remove a partial juror. While Robinson's counsel stated at trial that he would have removed another juror but for the court's refusal to excuse the two challenged jurors, Robinson has not shown that any member of his jury was partial or incompetent to sit. In the absence of such a showing, Robinson's impartial jury argument must fail.
 
 
 33
 Robinson also claims that the loss of his peremptory challenges amounts to a due process violation. The Court explicitly rejected that argument in Ross. Since peremptory challenges are created by statute and not the Constitution, due process is offended only if the defendant is denied that which the statute provides. Id. at 89. Since Robinson received his full complement of peremptory challenges, Ross forecloses his due process argument.[2]
 
 
 34
 Robinson has failed to show that the trial judge's failure to excuse two jurors for cause created a partial jury. Therefore, the district court properly denied habeas relief on this ground.
 
 VI.
 
 35
 Robinson's fifth argument is that his trial attorney's performance was so deficient as to amount to the denial of the effective assistance of counsel. We analyze a defense attorney's performance using the two-part test set forth in Strickland v. Washington, 466 U.S. 668 (1984). Robinson must show that his attorney made errors so serious that he was not functioning as the "counsel" guaranteed by the Sixth Amendment and that the errors prejudiced his defense. Id., 466 U.S. at 687.
 
 
 36
 Robinson points to seven errors allegedly committed by his attorney. First, his attorney did not object to Monica Scott's testimony. We find no prejudice to Robinson as we have already ruled that any error in the admission of Scott's testimony was harmless beyond a reasonable doubt.
 
 
 37
 Second, his attorney did not obtain the transcript of Shevonne Wilson's testimony from her earlier trial. We note, however, that the prosecution did not notify counsel until just before trial that Wilson would be called. Under those circumstances, failure to obtain the transcript of Wilson's earlier trial was excusable. Robinson also has failed to show how he was prejudiced by the failure to obtain the transcript. Unlike the habeas petitioner in Blackburn v. Foltz, 828 F.2d 1177, 1183-84 (6th Cir.1987), cert. denied, 485 U.S. 970 (1988), Robinson has not indicated how Wilson's prior testimony could have been used to impeach her.
 
 
 38
 Third, Robinson argues that his counsel should have produced Whittler's two co-workers who found her body several hours after her death. Their testimony would have been exculpatory, Robinson argues, because they saw Whittler's estranged husband, Jimmy, near the scene. However, the jury knew that Jimmy Whittler was present because Donald Brown, the first police officer on the scene, testified that he saw Jimmy Whittler drive away. Since the two unproduced witnesses could have added little to that which the jury already knew, their non-production did not prejudice Robinson.
 
 
 39
 Fourth, Robinson's attorney chose not to attack Shevonne Wilson's credibility in his closing argument. This decision was in keeping with the defense theory that Robbins, not Robinson, had killed Whittler. Wilson's testimony was not that Robinson had killed Whittler, but that Robinson and Robbins were present at the time. Since her testimony was not directly inculpatory and since Robinson's fingerprints were found at the scene, the defense counsel reasonably may have decided that it would be futile to attack Wilson's credibility. Instead, counsel argued that her testimony was consistent with the defense theory that Robbins had killed Whittler. Given the alternative of attacking the credibility of both Wilson and Robbins, we fail to see how counsel's strategic decision was deficient.
 
 
 40
 Fifth, counsel failed to request a cautionary instruction on accomplice testimony. However, such an instruction would have applied to the testimony of both Wilson and Robbins. Since counsel did not want to attack Wilson's credibility, the failure to request such an instruction was reasonable. We also find no prejudice, since counsel conducted an extensive cross-examination of Robbins in which he admitted that he had lied repeatedly about his role in the killing. From that cross-examination and counsel's closing argument, the jury was certainly aware that Robbins' credibility was at issue in the case.
 
 
 41
 Sixth, Robinson claims that his counsel erred in his cross-examination of a witness by opening the door to damaging evidence of Robinson's tendency to become violent when intoxicated. We cannot consider this claim, as Robinson did not present it to the district court. See Brown v. Marshall, 704 F.2d 333, 334 (6th Cir.), cert. denied, 464 U.S. 835 (1983).
 
 
 42
 Seventh, Robinson argues that his counsel should have identified which juror he would have removed had the trial court not forced him to exhaust his peremptory challenges to remove two other jurors. Since, as we indicated in Part V supra, Robinson has failed to allege that any member of his jury was partial or incompetent, counsel's failure to identify any such juror is harmless.
 
 
 43
 We therefore find that the district court properly denied Robinson habeas relief on his ineffective assistance of counsel claim.[3]
 
 
 44
 AFFIRMED.
 
 
 
 [1]
 Robinson also argues that his Confrontation Clause rights were violated by Scott's testimony suggesting Whittler's estranged husband had a motive to have Whittler killed. Robinson points to nothing in the record that would support his argument that this statement could have been the product of hypnosis
 
 
 [2]
 Robinson also claims that the alleged error violated his equal protection rights. As Robinson does not allege any sort of invidious classification, he has shown no equal protection violation. His argument is, in reality, a restatement of his due process claim that the judge's ruling arbitrarily deprived him of two peremptory challenges. This is, of course, the argument rejected in Ross
 
 
 [3]
 Robinson also claims that the cumulative effect of all of the trial court's alleged errors rises to the level of a violation of his right to a fair trial. Since we have found each of Robinson's claims to be meritless, we do not find that their aggregation amounts to a due process violation